UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MANN CONSTRUCTION, INC.,
BROOK WOOD, KIMBERLY WOOD,
LEE COUGHLIN, and DEBBIE COUGHLIN,

                           Plaintiffs,

v.

UNITED STATES OF AMERICA,

                           Defendant.

_____/

Case No. 1:20-cv-11307
Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris.

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING THE COMPLAINT**

This matter is before the court pursuant to the parties' cross-motions for summary judgment. ECF Nos. 38, 39. Plaintiffs are taxpayers claiming that an Internal Revenue Service ("IRS") revenue notice requiring them to disclose a potentially abusive transaction was issued without notice and comment in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. For the reasons set forth below, Defendant's Motion for Summary Judgment will be granted, Plaintiffs' Motion for Summary Judgment will be denied, and the Complaint will be dismissed.

**I.**

**A.**

This case concerns a conflict familiar to federal courts: a dispute between the IRS and a group of taxpayers who believe they have paid too much tax. Unlike the ordinary case, however, the parties here are not litigating the payment of a tax but the payment of a penalty—a penalty that, by operation of the Internal Revenue Code, Treasury regulations, and IRS tax guidance, is imposed regardless of whether any tax is owed. This penalty has its roots in a reporting regime

that is administered by the IRS and built on the notion that "the best way to combat tax shelters is to be aware of them." H.R. Rep. 108-548, at 261 (2004).

Many taxpayers want to "shelter" their income by deferring or reducing their tax liability. Some of these shelters, like certain employee welfare benefit funds, have received Congressional blessing. *See* 26 U.S.C. § 419. Others have not. In the early 1980s, Congress confronted the "growing phenomenon of abusive tax shelters" with legislation targeting tax shelter promoters.[1] S. Rep. 97-494, at 266 (1982). Shortly after enacting civil and criminal penalties in I.R.C. §§ 6700 and 6701 for promoters, Congress passed the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494 (1984), which added I.R.C. §§ 6111, 6112, 6707, and 6708. Sections 6111 and 6112 required tax shelter "organizers" to register the shelters in a manner prescribed by the Treasury and to maintain a list of investors. These requirements were enforced by civil penalties in §§ 6707 and 6708. Congress enacted this reporting regime because, without one, "promoters kn[ew] that even if a tax scheme they market is clearly faulty, some investors' incorrect returns will escape detection." H.R. Rep. 98-432, at 1351 (1984). The tax shelters of the 1970s and 80s were eventually curtailed by the Tax Reform Act of 1986, Pub L. 99-514, 100 Stat. 2716 (1986), which added I.R.C. § 469 to limit passive activity losses.

By the 1990s, a new generation of tax shelters had emerged, and regulators felt that the rules at their disposal were not up to the challenge. Saltzman, *supra*, ¶ 7B.18. The Treasury thus issued temporary regulations under I.R.C. § 6011 requiring corporate taxpayers to disclose their participation in "reportable transactions." 65 Fed. Reg. 11,205 (Mar. 2, 2000). Notably, whether a transaction was "reportable" turned on whether it was the "same as or substantially similar to" a "listed transaction" identified by the IRS. *Id.* The Treasury continued to develop its flexible

---

[1] The history of the IRS reporting regime is discussed in greater detail in Michael I. Saltzman, IRS Practice and Procedure ¶ 7B.18 (2020).

reporting regime over the following years but lacked authority to penalize taxpayers for failure to disclose. Saltzman, *supra*, ¶ 7B.18. Congress addressed this problem in 2004 by passing the American Jobs Creation Act of 2004, Pub L. 108-357, 118 Stat. 1418 (2004), which created I.R.C. § 6707A. Section 6707A laid the statutory foundation for the new reporting regime by establishing penalties for nondisclosure and defining "reportable transaction" and "listed transaction" by reference to Treasury regulations. *See* 26 U.S.C. § 6707A.

Since then, the IRS has identified many listed transactions by notice, in effect requiring taxpayers to disclose their participation or face substantial penalties under I.R.C. § 6707A. One of these revenue notices is IRS Revenue Notice 2007-83, the subject of controversy here.

### B.

Employers sometimes provide life insurance coverage to employees through special trusts or organizations ("welfare benefit funds") and deduct at least part of their contributions under I.R.C. § 419. *See* Edwin T. Hood & John J. Mylan, 1 Federal Taxation of Close Corporations § 2:49 (2020). Often, the welfare benefit fund will offer "group term life insurance," which, for a limited time, provides a death benefit to participating employees in exchange for a premium—most or all of which is paid by the employer. Julia Kagan, *Group Term Life Insurance*, Investopedia (Jul. 4, 2020), https://www.investopedia.com/terms/g/group-term-life-insurance.aspEmployers [https://perma.cc/HDN5-2ZPN]. Employers can deduct the cost of premiums up to the "qualified cost" of the welfare benefit fund, which is typically the current cost of insurance. *See* 26 U.S.C. § 419(b); *see also Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 229 (3d Cir. 2002) (finding "contributions in excess of the amounts necessary to pay for annual term life insurance protection" to be nondeductible).

This case concerns a similar arrangement involving "cash value life insurance," also called "whole life insurance."[2] Cash value life insurance is commonly understood as an investment vehicle combining permanent life insurance coverage with a cash value investment account. Julia Kagan, *Cash Value Life Insurance*, Investopedia (Jul. 8, 2020), https://www.investopedia.com/terms/c/cash-value-life-insurance.asp [https://perma.cc/SLS2-358E]. Whole life insurance ordinarily offers a guaranteed minimum rate of return on the cash value, regular premium rates, and a guaranteed death benefit. *See* Ryan Frailich, *Forbes Guide to Whole Life Insurance*, Forbes (Mar. 27, 2020), https://www.forbes.com/advisor/life-insurance/whole-life-insurance/ [https://perma.cc/2Q5X-T9C2]. Other forms of cash value life insurance offer the same features in different varieties. "Universal life insurance," for example, usually provides a variable rate of return, as well as an adjustable death benefit and premium. Ashley Chorpenning, *Understanding Universal Life Insurance*, Forbes (Jul. 17, 2020), https://www.forbes.com/advisor/life-insurance/universal-life-insurance/ [https://perma.cc/Z5S9-LBL5].

Whole life insurance is usually priced above term life insurance given that part of the regular premium funds the cash value component in addition to the death benefit. *Id*. The policyholder can, under certain terms, borrow or withdraw the cash value, which accumulates on a tax-deferred-basis like a qualified 401(k) or IRA plan. *Id*. However, the restrictions on the death benefit, coupled with the limited rate of return on the cash value, make whole life insurance a particularly long-term and conservative form of investment. *Id*.

---

[2] The operation and tax consequences of whole life insurance are further discussed in *Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 766–67 (S.D. Ohio 2001) (discussing the operation of whole life insurance in the context of the sham transaction doctrine), *aff'd sub nom. Am. Elec. Power Co. v. United States*, 326 F.3d 737 (6th Cir. 2003).

## II.

## A.

The facts in this case are not in dispute. Plaintiffs Brook Wood and Lee Coughlin and their respective spouses, Kimberly Wood and Debbie Coughlin, are Michigan residents. ECF No. 1 at PageID.2. Brook Wood and Lee Coughlin are the sole and co-equal shareholders of Mann Construction, Inc. ("Mann Construction"), a Michigan corporation. Mann Construction is "a general contractor that also provides construction management and design-build services." *Id.* at PageID.15. In addition to being owners, Wood and Coughlin are "key employees" of Mann Construction. *Id.* at PageID.16. Mann Construction is an "S-Corporation," having elected to be taxed under Subchapter S of Chapter 1 of the Code. *Id.* As a result, income to Mann Construction is "passed through" to Wood and Coughlin.

In 2013, Mann Construction established the Mann Construction, Inc. Death Benefit Trust and Restricted Property Trust (the "Benefits Trust" or the "DBT/RPT").[3] *Id.* at PageID.15. Plaintiffs describe the rather complex operation of the DBT/RPT in a document supporting their 2013 Form 8275 (Disclosure Statement). *See* ECF No. 1-1. Plaintiffs included the same Form 8275 and supporting document as an exhibit to their complaint. *Id.* Plaintiffs discuss the DBT/RPT as follows:

> In Tax Year 2013, on or about December 17, 2013, Taxpayer [Mann Construction] established two irrevocable trusts, known as the Mann Construction, Inc. Death Benefit Trust and the Mann Construction, Inc., Restricted Property Trust. The terms and conditions of each Trust are more fully set forth in a certain Mann Construction, Inc. Benefits Trust Agreement (herein called the "Trust Agreement"). Pursuant to the Trust Agreement, the Death Benefit Trust and Restricted Property Trust are irrevocable. Each Trust is a taxable trust under Subchapter J of the Internal Revenue Code. The Trustee of each Trust is Aligned Partners Trust Company, an independent third-party trustee. The business and tax purposes of the Trust are as follows: (1) with respect to the Death Benefit Trust, the purpose is to further the development or continuation of

---

[3] Other taxpayers have participated in "identical DBT/RPT benefit plans." ECF No. 1 at PageID.12.

the taxpayer's business and contributions, which are made in furtherance of a *bona fide* profit objective independent of tax consequences; and (2) with respect to the Restricted Property Trust, the purpose is to provide the employee an appreciating property interest, namely a beneficial interest in the Restricted Property Trust, that is subject to a substantial risk of forfeiture, in consideration for employee's continued provision of valuable services to Taxpayer. Contributions to the Restricted Property Trust are not deductible by the Taxpayer unless, as the employee has done, the employee includes such contribution in income currently by filing an Internal Revenue Code ("IRC") Section 83(b) election. The facts and circumstances of the Death Benefit Trust, in particular the triggering of the substantial risk of forfeiture if the base policy premium (*i.e.*, the current cost of the death benefit) is not received by the independent third party trustee, clearly establishes that the Death Benefit Trust is established in furtherance of a *bona fide* profit objective independent of tax consequences, and moreover is intended to incentivize and retain key employees. *See* [*Curcio v. Comm'r*, 689 F.3d 217, 225 (2d Cir. 2012)] and [*Schneider v. Comm'r*, 63 T.C.M. (CCH) 1787 (T.C. 1992)].

The Taxpayer's agreement to make contributions to the Death Benefit Trust arises from a certain Death Benefit Agreement entered into between the Taxpayer and employee. Therein the Taxpayer agrees to make contributions to the Death Benefit Trust in an amount not to exceed the base policy premium with respect to a pure whole life insurance policy owned by the Death Benefit Trust, insuring the employee. Nevertheless, the Taxpayer's agreement to make the annual Death Benefit Trust contribution is dependent upon available cash of the Taxpayer and the employee continuing as an employee (as the entire and sole purpose of the Death Benefit Trust is to pay the current cost of the death benefit). Likewise, the construct of the Death Benefit Trust is such that the Trustee must receive in each year following the effective date of the Death Benefit Trust, a contribution with respect to the employee that is not less than or more than the base policy premium with respect to the whole life policy insuring the employee. If the Trustee does not receive the required contribution to the Death Benefit Trust, and the employee has not previously died, then the whole life insurance contract lapses, leading to a forfeiture of the entire cash surrender value of the policy to a designated charitable organization; this latter such transfer is from the Restricted Property Trust based on the substantial risk of forfeiture inherent in this latter Trust.

The Trustee of the Death Benefit Trust is required to use the contributions from Taxpayer to pay the base policy premium with respect to the whole life insurance policy insuring the employee. The whole life insurance policy contract specifically provides that the current cost of the life insurance protection under the policy (plus administrative costs and expenses) is an amount equal to the base policy premium. The base policy premium for the policy on the present participating employees' lives is $70,000.00. The Trustee of the Death Benefit Trust is the owner and beneficiary of the life insurance policy; provided, however, the Trustee has no legal right to access the cash values; similarly, neither the

- 6 -

Taxpayer, nor the insured employee, has access to the cash value. The Trustee holds legal title to the policies. The beneficial owners of the Death Benefit Trust are either the beneficiary designated by the employee to receive the death proceeds and, in all other cases, the Restricted Property Trust. The beneficial owners of the Restricted Property Trust are the employee if the risk of forfeiture does not occur and an IRC Section 501(c)(3) charitable organization if the risk of forfeiture does occur.

The whole life insurance policy contract provides that if the base policy premium is not timely paid, the policy will lapse. Likewise, the Death Benefit Trust, which is the owner of the whole life insurance policy, buttresses the contractual language inherent in the policy insofar as if the Trustee does not receive a contribution sufficient to pay the base policy premium, then, in accordance with the Death Benefit Trust provisions, the entire cash surrender value is paid to the Restricted Property Trust. This transfer to the Restricted Property Trust is in satisfaction of the Restricted Property Trust's security interest. No prepayment of subsequent year base policy premiums is permissible; similarly the Trustee of the Death Benefit Trust cannot borrow from the cash surrender value to fund base policy premium obligations. Furthermore, if a base policy premium is not timely received by the Trustee, the Trustee of the Death Benefit Trust is required to surrender the policy and receive the cash surrender value proceeds. The Trustee is then required to pay the cash surrender value proceeds to the Restricted Property Trust, which in turn, in accordance with the terms of the Restricted Property Trust, must transfer the cash surrender value to an IRC Section 501(c)(3) charitable organization (discussed below).

If Taxpayer makes the base policy premium contributions to the Death Benefit Trust throughout the term of the Restricted Property Trust and the Death Benefit Trust (*i.e.*, five (5) years), then the employee becomes vested in the assets of the Restricted Property Trust. The asset owned by the Restricted Property Trust is the cash surrender value of the policy insuring the employee. At this time, the entire value of the Restricted Property Trust becomes taxable to the employee, in accordance with IRC Section 83. Accordingly, the Trustees of the Restricted Property Trust and Death Benefit Trust shall execute such documents as necessary to transfer the policy (inclusive of its cash value) to the employee. This transfer is taxable to the employee.

Pursuant to a certain Restricted Property Agreement entered into between Taxpayer and employee, the Taxpayer agrees to makes certain contributions to Aligned Partners Trust Company, Trustee of the Restricted Property Trust. All contributions to the Restricted Property Trust are to be invested by the Trustee of the Restricted Property Trust as paid-up additions with respect to the life insurance policy owned by the Death Benefit Trust. In no event can the investment by the Restricted Property Trust be used by the Death Benefit Trust to fund the base policy premium for the current year or any future years. To secure the Restricted Property Trust's investment in the Death Benefit Trust, the Death

Benefit Trust shall grant to the Restricted Property Trust a security interest covering the entire cash value of the whole life insurance policy.

In the event the policy lapses, due to Taxpayer's failure to make a base policy premium contribution during the term of the Death Benefit Trust (*i.e.*, five (5) years), the cash surrender value proceeds attributable to such lapse are required to be paid to the Restricted Property Trust in full satisfaction of the security interest previously granted by the Death Benefit Trust. In accordance with the terms of the Restricted Property Trust, to the extent this lapse occurs prior to the expiration of the term of the Restricted Property Trust (*i.e.*, five (5) years), the Restricted Property Trust shall transfer the entirety of the cash surrender value received to a charitable organization previously designated by the employee.

Accordingly, the employee's rights with respect to the amounts invested as paid-up additions, and the entirety of the cash surrender value, are subject to a substantial risk of forfeiture (within the meaning of IRC Section 83). In other words, if either the employee terminates employment with the Taxpayer, or if the Taxpayer does not make the necessary contribution to the Death Benefit Trust to pay the base policy premium during the term of the Restricted Property Agreement, or if the Taxpayer terminates the Death Benefit Trust, then the whole life insurance policy will lapse and the cash surrender value proceeds shall be transferred by the Trustee, in accordance with the express language of the Restricted Property Trust, to an IRC Section 501(c)(3) charitable organization. Therefore, the employee will not be entitled to receive the cash surrender value of such life insurance policy. Having said that, if none of the preceding events occur prior to the lapse of the Restricted Property Trust (*i.e.*, five (5) years) then, at that time, the Trustee of the Restricted Property Trust shall transfer the life insurance policies to the respective employees, who shall include in gross income the value of the life insurance policy received, less any amounts previously included in gross income pursuant to any elections made by such employee under IRC Section 83(b).

Pursuant to the terms of the Restricted Property Agreement, the employee agreed to make an IRC Section 83(b) election to include the Restricted Property Trust contribution (*i.e.*, up to $30,000.00 annually for the current participants) in his taxable income in the year of contribution. The contribution by the Taxpayer to the Restricted Property Trust constitutes a transfer of property for purposes of IRC Section 83. *See* Treasury Regulation Section l.83-3(e). Therefore, Taxpayer is entitled to a deduction in the current year, equal to such amount, under IRC Sections 83(h), 162, and 402(b).

ECF No. 1-1 at PageID.34–37. Plaintiffs summarize the expected tax consequences of the

DBT/RPT as follows,

(i) [Wood and Coughlin] [were] required to include in income the value of the economic benefit of the current death benefit based on the current cost of such death benefit; (ii) the entirety of the contribution to the Restricted Property Trust even though the employee had no current or future right to such money as it was subject to a Risk of Forfeiture which would result in a charity receiving all such assets; (iii) if the Risk of Forfeiture expired, the Trustee would send a Form 1099 to the employee reporting the entire value of the Policy as taxable; and (iv) Mann was entitled to a deduction in accordance with the express provisions of IRC §§ 61 and 419 for contributions to the DBT and in accordance with the express provisions of IRC §§ 162 and 83(h) for contributions to the RPT.

ECF No. 1 at PageID.20.

**B.**

On November 5, 2007, the IRS published a revenue notice entitled "Abusive Trust Arrangements Utilizing Cash Value Life Insurance Policies Purportedly to Provide Welfare Benefits," I.R.S. Notice 2007-83, 2007-2 C.B. 960 (the "Notice"). The Notice explains,

> The Internal Revenue Service (IRS) and Treasury Department are aware of certain trust arrangements claiming to be welfare benefit funds and involving cash value life insurance policies that are being promoted to and used by taxpayers to improperly claim federal income and employment tax benefits. This notice informs taxpayers and their representatives that the tax benefits claimed for these arrangements are not allowable for federal tax purposes. This notice also alerts taxpayers and their representatives that these transactions are tax avoidance transactions and identifies certain transactions using trust arrangements involving cash value life insurance policies, and substantially similar transactions, as listed transactions for purposes of § 1.6011-4(b)(2) of the Income Tax Regulations and §§ 6111 and 6112 of the Internal Revenue Code. This notice further alerts persons involved with these transactions of certain responsibilities that may arise from their involvement with these transactions.

I.R.S. Notice 2007-83, 2007-2 C.B. 960. The Notice thereby notifies taxpayers of their duty to report their participation in a "listed transaction" or "substantially similar" transaction to the Office for Tax Shelter Analysis ("OTSA") by filing a Form 8886.[4] The Notice describes a "listed transaction" as follows:

---

[4] The regulatory authority for requiring disclosure derives from 26 C.F.R. § 1.6011-4. The section provides, "Every taxpayer that has participated . . . in a reportable transaction within the meaning of paragraph (b) of this section and who is required to file a tax return must file within the time prescribed in

Any transaction that has all of the following elements, and any transaction that is substantially similar to such a transaction, are identified as "listed transactions" for purposes of § 1.6011-4(b)(2) and §§ 6111 and 6112, effective October 17, 2007, the date this notice is released to the public.

(1) The transaction involves a trust or other fund described in § 419(e)(3) that is purportedly a welfare benefit fund.

(2) For determining the portion of its contributions to the trust or other fund that are currently deductible the employer does not rely on the exception in § 419A(f)(5)(A) (regarding collectively bargained plans).

(3) The trust or other fund pays premiums (or amounts that are purported to be premiums) on one or more life insurance policies and, with respect to at least one of the policies, value is accumulated either:

    (a) within the policy (for example, a cash value life insurance policy); or

    (b) outside the policy (for example, in a side fund or through an agreement outside the policy allowing the policy to be converted to or exchanged for a policy which will, at some point in time, have accumulated value based on the purported premiums paid on the original policy).

(4) The employer has taken a deduction for any taxable year for its contributions to the fund with respect to benefits provided under the plan (other than post-retirement medical benefits, post-retirement life insurance benefits, and child care facilities) that is greater than the sum of the following amounts:

    (a) With respect to any uninsured benefits provided under the plan,

        (i) an amount equal to claims that were both incurred and paid during the taxable year; plus

        (ii) the limited reserves allowable under § 419A(c)(1) or (c)(3), as applicable; plus

        (iii) amounts paid during the taxable year to satisfy claims incurred in a prior taxable year (but only to the extent that

---

paragraph (e) of this section a disclosure statement in the form prescribed by paragraph (d) of this section." 26 C.F.R. § 1.6011-4(a). Subsection (b) states that "[a] reportable transaction is a transaction described in any of the paragraphs (b)(2) through (7) of this section." *Id.* § 1.6011-4(b). Under paragraph (b)(2), "a listed transaction is a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service (IRS) has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction." *Id.* § 1.6011-4(b)(2).

- 10 -

no deduction was taken for such amounts in a prior year); plus

(iv) amounts paid during the taxable year or a prior taxable year for administrative expenses with respect to uninsured benefits and that are properly allocable to the taxable year (but only to the extent that no deduction was taken for such amounts in a prior year).

(b) With respect to any insured benefits provided under the plan,

(i) insurance premiums paid during the taxable year that are properly allocable to the taxable year (other than premiums paid with respect to a policy described in (3)(a) or (b) above); plus

(ii) insurance premiums paid in prior taxable years that are properly allocable to the taxable year (other than premiums paid with respect to a policy described in (3)(a) or (b) above); plus

(iii) amounts paid during the taxable year or a prior taxable year for administrative expenses with respect to insured benefits and that are properly allocable to the taxable year (but only to the extent that no deduction was taken for such amounts in a prior year).

(c) For taxable years ending prior to November 5, 2007, with respect to life insurance benefits provided through policies described in (3)(a) and (b) above, the greater of the following amounts:

(i) in the case of an employer with a taxable year that is the calendar year, the aggregate amounts reported by the employer as the cost of insurance with respect to such policies on the employees' Forms W-2 (or Forms 1099) for that year, plus an amount equal to the amounts that would have been reportable on the employees' Forms W-2 for that year, but for the exclusion under section 79 (relating to the cost of up to $50,000 of coverage); or, in the case of an employer with a taxable year other than the calendar year, the portions of the aggregate amounts reported by the employer on the Forms W-2 (or Forms 1099) as described in (i), above, (or that would have been reported absent the exclusion under § 79) that are properly allocable to the employer's taxable year; and

- 11 -

       (ii)    with respect to each employee insured under a cash value life insurance policy, the aggregate cost of insurance charged under the policy or policies with respect to the amount of current life insurance coverage provided to the employee under the plan (but limited to the product of the current life insurance coverage under the plan multiplied by the current year's mortality rate provided in the higher of the 1980 or 2001 CSO Table).

     (d)  The additional reserve, if any, under § 419A(c)(6) (relating to medical benefits provided through a plan maintained by a *bona fide* association), but only to the extent amounts are not already included above in this paragraph (4), and only to the extent that no deduction was taken for such amounts in a prior taxable year.

I.R.S. Notice 2007-83, 2007-2 C.B. 960. The Notice further provides that "[p]ersons required to disclose or register these transactions under § 6111 who have failed to do so may be subject to the penalty under § 6707(a)." *Id.* The Notice also establishes the Service's intent to challenge the listed transactions and its rationale for doing so:

> If, based on the facts and circumstances, an arrangement described above is properly characterized as a welfare benefit fund for purposes of §§ 419 and 419A (rather than a dividend arrangement, a plan deferring the receipt of compensation, or a split-dollar life insurance arrangement), an employer is allowed a deduction for contributions to the trust or other welfare benefit fund only to the extent allowed under §§ 419 and 419A. Under §§ 419 and 419A, no deduction is allowed with respect to premiums paid for life insurance coverage provided to current employees if the welfare benefit fund or the employer is directly or indirectly a beneficiary under the life insurance policy within the meaning of § 264(a). In the promoted arrangements discussed above, the trust typically retains rights in the life insurance policies and is directly or indirectly a beneficiary under the policies, so that no deduction is allowed with respect to the life insurance premiums. *See* Situation 1 in Rev. Rul. 2007-65.

I.R.S. Notice 2007-83, 2007-2 C.B. 960. As indicated, the Service's rationale is largely premised on its analysis in the simultaneously issued Revenue Ruling 2007-65.

**C.**

When filing its Form 1120S for tax year 2013 ("TY 2013"),[5] Mann Construction included a Form 8275 (Disclosure Statement) and a supporting document, "Exhibit A," quoted in part above, where it disclosed its contributions to the DBT/RPT and provided its legal rationale for the tax treatment. *See* ECF No. 1-1.

On May 9, 2019, the IRS issued a proposed adjustment to Mann Construction's Form 1120S, disallowing deductions for Mann Construction's contributions to the DBT/RPT for TY 2013 to 2017. ECF No. 1 at PageID.22. The disallowed deductions increased the income and tax liability of both Wood and Coughlin. *Id.* The IRS subsequently imposed 6707A penalties on Mann Construction, Wood, and Coughlin for TY 2013 to 2017 for failure to disclose participation in the DBT/RPT. *Id.* at PageID.2–3. The TY 2013 penalties were as follows: $10,000 for Mann Construction, $8,642.25 for Coughlin, and $7,794.00 for Lee.[6] *Id.* On November 26, 2019, Plaintiffs paid the 6707A penalties for TY 2013 and filed a Form 843 requesting a refund of the amount paid. ECF No. 1 at PageID.23.

**D.**

Plaintiffs filed this action on May 26, 2020. They alleged four counts in their Complaint: three purported violations of the Administrative Procedure Act ("APA") and one claim for a refund. *Id.* at PageID.23–29. Specifically, Plaintiffs alleged that the Notice was an "unauthorized agency action" (Count I); that the Notice was "arbitrary and capricious" (Count II); that the Notice was improperly issued without public notice and comment (Count III); and that the DBT/RPT was not a listed transaction or substantially similar to one (Count IV). *Id.* Plaintiffs

---

[5] A Form 1120S is an income tax return form used by S-corporations.
[6] Under I.R.C. § 6707A, the penalty is "75 percent of the decrease in tax shown on the return as a result of such transaction (or which would have resulted from such transaction if such transaction were respected for Federal tax purposes)," with a minimum penalty of $10,000 for entities and $5,000 for natural persons. 26 U.S.C. § 6707A(b).

also alleged that the statute of limitations barred imposition of the 6707A penalty for TY 2013. *Id.* at PageID.5, 23.

On August 20, 2020, Defendant moved to dismiss the Complaint for failure to state a claim. ECF No. 15. By that time, Plaintiffs had concurred in the dismissal of any claim for injunctive or declaratory relief, so the only claim for relief remaining was for a judgment awarding damages in the amount of the 6707A penalty assessed for TY 2013. ECF No. 15 at PageID.72.

On October 20, 2020, this Court entered an opinion and order granting in part and denying in part Defendant's Motion to Dismiss. ECF No. 22. Counts I, II, and IV were dismissed, but with respect to Count III, this Court held that "Plaintiffs [] plausibly alleged that the Notice is a legislative rule that should be set aside for failure to comply with notice and comment." *Id.* at PageID.255. Plaintiffs later moved for reconsideration of the dismissal of Count IV, ECF No. 23, but their motion was subsequently denied, ECF No. 30.

Defendant answered the Complaint on November 13, 2020. ECF No. 33. Consistent with the Scheduling Order entered on December 9, 2020, ECF No. 37, the parties have since filed cross-motions for summary judgment, ECF Nos. 38, 39. Timely response and reply briefs have also been filed. ECF Nos. 41, 42, 43, 44.

## II.

"The APA establishes the procedures federal administrative agencies use for 'rule making,' defined as the process of 'formulating, amending, or repealing a rule.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (citing 5 U.S.C. § 551(5)). Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. §

702. The APA further empowers federal courts to set aside unlawful agency action.

> (2) [The reviewing court shall] hold unlawful and set aside agency action, findings, and conclusions found to be—

>> (C) without observance of procedure required by law; . . . .

5 U.S.C. § 706(2). "When a federal court is reviewing a final agency action, the usual rules and

standards governing summary judgment do not apply." *KPK Techs., Inc. v. Cuccinelli*, No. 19-

10342, 2019 WL 4416689, at *3 (E.D. Mich. Sept. 16, 2019) (citing *Alexander v. Merit Sys.

Prot. Bd.*, 165 F.3d 474, 480–81 (6th Cir. 1999)). "[S]ummary judgment 'serves as the

mechanism for deciding, as a matter of law, whether an agency action is supported by the

administrative record and is otherwise consistent with the APA standard of review.'" *Singh v.

Johnson*, No. 15-CV-12957, 2016 WL 3476701, at *3 (E.D. Mich. June 27, 2016) (quoting

*Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 106 (D.D.C. 2016)).

### III.

The only remaining issue in this case is whether the IRS was required to provide public

notice and an opportunity for comment before promulgating the Notice.

### A.

The APA provides a three-step procedure for "notice-and-comment rulemaking" whereby

agencies are required to (1) issue a general notice of proposed rulemaking, (2) allow interested

persons an opportunity to participate, and (3) include in the final rule a "concise general

statement of [its] basis and purpose." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)

(discussing the notice and comment procedure in 5 U.S.C. § 553). However, "[n]ot all 'rules'

must be issued through the notice-and-comment process . . . [T]he notice-and-comment

requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of

agency organization, procedure, or practice.'" *Id.* at 96 (quoting 5 U.S.C. § 553(b)). "The APA also recognizes that Congress may modify these requirements [] but provides that a '[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly.'" *Asiana Airlines v. F.A.A.*, 134 F.3d 393, 396 (D.C. Cir. 1998) (quoting 5 U.S.C. § 559).

In its Motion to Dismiss, Defendant advanced two arguments regarding Plaintiffs' notice-and-comment claim: (1) that the Notice was an interpretive rather than legislative rule; and (2) that even if the Notice were a legislative rule, Congress had authorized its promulgation by a procedure other than notice and comment. *See* ECF No. 15 at PageID.94–101. The first argument was rejected because, as this Court explained, "[t]he Notice . . . defines a set of transactions to which the statutory duty to report applies," and "[t]axpayers who fail to comply are subject to substantial penalties." ECF No. 22 at PageID.254. Accordingly, the Notice is a legislative rule that "changes taxpayers' rights and obligations." *Id.* (quoting *Cohen v. United States*, 578 F.3d 1, 9 (D.C. Cir. 2009), *reh'g en banc granted in part, opinion vacated in part*, 599 F.3d 652 (D.C. Cir. 2010), *and on reh'g en banc in part*, 650 F.3d 717 (D.C. Cir. 2011)).

With respect to the second argument, this Court declined to hold that Congress had excepted the Notice from the APA because Defendant had not offered any "controlling authority for an exception to notice and comment based on Congressional intent." *Id.* at PageID.255. Indeed, the only case that Defendant identified was the D.C. Circuit's decision in *Asiana Airlines*, *supra*, which this Court found sufficiently distinguishable to allow Count III to survive a motion to dismiss.[7] *Id.*

---

[7] While Defendant recounted the legislative history of section 6707A at some length in its Motion to Dismiss, *Asiana Airlines* was only mentioned once along with a parenthetical explanation. ECF No. 15 at PageID.103. In its reply brief, Defendant made no mention of *Asiana Airlines* but exclusively discussed

For purposes of summary judgment, however, Defendant relies exclusively on the argument that Congress authorized the IRS to promulgate the Notice without the notice and comment period required by the APA. *See* ECF No. 38 at PageID.365–66.

## B.

In essence, this case turns on two competing views of the APA and listed transaction regime. Under Plaintiffs' view, Congress intended the listed transaction regime to be consistent with, rather than exempt from, the ordinary requirements of administrative rulemaking. *See* ECF No. 39 at PageID.400–02. Plaintiffs concede that the IRS can identify listed transactions by revenue notice but maintain that the agency must provide public notice and an opportunity for comment before doing so. *Id.* Under Defendant's view, Congress intended for the IRS to occupy an exceptional role with respect to tax shelter reporting—a role that allows it to identify listed transactions without compliance with APA procedure. *See* ECF No. 38 at PageID.365–66. Defendant argues that this view is most consistent with "the statutory text and the chronology of the statute and regulations." ECF No. 44 at PageID.584. After thoroughly reviewing the briefing, statutory text, and legislative record, Defendant would seem to have the better argument.

Defendant's principal argument relies on the text of the Internal Revenue Code and its relationship to certain Treasury regulations. Under I.R.C. section 6707A, "[t]he term 'listed transaction' means a reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011." 26 U.S.C. § 6707A(c)(2). "Reportable transaction," in turn, is defined as "any transaction with respect to which information is required to be included with a return or statement because, as determined under regulations prescribed under section 6011, such

---

its argument that the Notice was an interpretive rather than legislative rule. *See* ECF No. 19 at PageID.200–01.

transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion." *Id.* § 6707A(c)(1). Accordingly, section 6707A incorporates by reference 26 C.F.R. § 1.6011-4, which allows the IRS to identify listed transactions "by notice, regulation, or other form of published guidance." 26 C.F.R. § 1.6011-4(b)(2). Defendant concludes, "By incorporating the regulation into the statute, Congress authorized and instructed the IRS to continue following that regulation, including the provision permitting the IRS to identify listed transactions via notice." ECF No. 38 at PageID.376.

On first impression, Defendant's conclusion would seem problematic because neither section 6707A nor the relevant regulations reference the APA. As stated previously, the APA limits the ability of a subsequent statute to modify or supersede its procedures "except to the extent that it does so expressly." 5 U.S.C. § 559. Consistent with this limiting language, courts have held that section 559 "forbids amendment of the APA by implication." *Lane v. U.S. Dep't of Agric.*, 120 F.3d 106, 110 (8th Cir. 1997); *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1127 (7th Cir. 2008) ("Section 559 therefore prevents a statute from amending the APA by implication.").

Nonetheless, courts have long refrained from interpreting section 559 as requiring some statutory language expressly superseding the APA. In *Marcello v. Bonds*, 349 U.S. 302 (1955), the Supreme Court held that the Immigration and Nationality Act of 1963 (the "INA"), rather than the APA, governed deportation proceedings, despite the lack of any clause superseding the APA. After reviewing the text and history of the INA, the Court concluded,

> Exemptions from the terms of the Administrative Procedure Act are not lightly to be presumed in view of the statement in s 12 of the Act that modifications must be express[.] But we cannot ignore the background of the 1952 immigration legislation, its laborious adaptation of the Administrative Procedure Act to the deportation process, the specific points at which deviations from the Administrative Procedure Act were made, the recognition in the legislative

- 18 -

> history of this adaptive technique and of the particular deviations, and the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceedings. Unless we are to require the Congress to employ magical passwords in order to effectuate an exemption from the Administrative Procedure Act, we must hold that the present statute expressly supersedes the hearing provisions of that Act.

*Id.* at 310 (internal citation omitted). More recently, the D.C. Circuit has held that when "Congress sets forth specific procedures that express its clear intent that APA notice and comment procedures need not be followed, an agency may lawfully depart from the normally obligatory procedures of the APA."[8] *Asiana Airlines*, 134 F.3d at 398 (internal quotation marks and alterations omitted).

In *Asiana Airlines*, several foreign airliners challenged an "FAA Interim Final Rule imposing annual fees totaling nearly $100 million on flights that neither take off from nor land in the United States." *Id.* at 395. The airlines argued that the Interim Final Rule ("IFR") had been promulgated without notice and comment in violation of the APA. *Id.* at 396. Relying on *Marcello* and other precedent, the D.C. Circuit articulated the question on appeal as "whether Congress ha[d] established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Id.* at 397.

Accordingly, the court compared the statutory framework that Congress had enacted in Federal Aviation Reauthorization Act, 49 U.S.C. § 45301, with the framework set forth in the APA. In doing so, the court noted that "Congress provided express direction to the FAA regarding its procedure for establishing fees for overflights" and that such procedures—which required the issuance of "an interim final rule"—"differ[ed] from those of the APA." *Id.* at 398.

---

[8] Neither Plaintiffs nor Defendant have identified any binding Sixth Circuit authority regarding the application of 5 U.S.C. § 559 and the APA's notice and comment procedures. Accordingly, this Court must turn to persuasive authority. With respect to the application of section 559, D.C. Circuit authority has been cited by Plaintiffs and Defendant in this case, and by other circuits. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 578 (9th Cir. 2018) (citing *Asiana Airlines*, *supra*).

- 19 -

The court also looked to the legislative history of the Federal Aviation Reauthorization Act, which "demonstrate[d] that Congress sought rapid action from the agency to begin recovering costs of services provided to overflights through FAA-controlled airspace which [until then] had been 'free riders.'" *Id.* at 398. The court held,

> In this statutory scheme, Congress specified procedures under § 45301(b)(2) that cannot be reconciled with the notice and comment requirements of § 553. . . . Were we to hold that the FAA had to issue a proposed rule and allow meaningful opportunity to comment before issuing the IFR, the resulting process would be so nearly indistinguishable from normal notice and comment as to deprive this special procedural provision of any effect, and to thwart the apparent intent of Congress in enacting the special procedure. It is therefore not difficult to conclude that Congress in this case purposely and expressly created an exception to the otherwise-applicable APA notice and comment procedures.

*Id.* Since *Asiana Airlines* was decided, the D.C. Circuit has continued to compare statutory frameworks when deciding whether a subsequent statute supersedes the APA. *See, e.g., Env't Integrity Project v. United States Env't Prot. Agency*, 177 F. Supp. 3d 36, 43 (D.D.C. 2016) (holding that Congress did not "express intent to exempt the [Clean Water Act] from the general provisions of FOIA" where plaintiffs identified "no clear FOIA-displacing language," "specific information-disclosure procedures" or "comprehensive, 'freestanding' scheme"), *aff'd sub nom. Env't Integrity Project v. Env't Prot. Agency*, 864 F.3d 648 (D.C. Cir. 2017); *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 17 (D.D.C. 2010)

In *Sebelius*, a corporation consisting of managed behavioral health care organizations ("MBHOs") challenged certain interim final rules promulgated under the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), Pub. L. No. 110-343, 122 Stat. 3861 (2008). *Sebelius*, 709 F. Supp. 2d at 11–13. The MHPAEA, which "amend[ed] the Employee Retirement Security Act of 1974 ('ERISA'), the Public Health Service Act, and the Internal Revenue Code, with parallel provisions," "require[ed] employer-sponsored group health plans to cover mental

illness and substance abuse on the same basis as physical conditions." *Id.* at 13. The challenged rules had been drafted by the Departments of Health and Human Services, Labor and Treasury to implement the statute. According to the plaintiff, however, these rules "expand[ed] the reach of the MHPAEA and . . . threaten[ed] the longstanding practices [of] MBHOs" by, *inter alia*, requiring "that health plans maintain a single deductible for medical/surgical and behavioral health benefits." *Id.* at 14. The plaintiff also argued that the rules were invalid because they were promulgated without adequate notice and comment.

The procedural portion of *Sebellius*, *supra*, turned on certain statutory language, which stated, "The Secretary may promulgate any interim final rules as the Secretary determines are appropriate to carry out this [part]." *Id.* (quoting 29 U.S.C. § 1191c). The Departments argued that this language authorized them to issue the challenged rules without notice and comment. The D.C. District Court, however, disagreed and held that the interim final rules were subject to notice and comment. The court reasoned that while the "statutory language [in *Asiana Airlines*] was mandatory and directed at a specific rulemaking procedure," the enabling language cited by the Departments was "permissive," "wide-ranging," and "d[id] not contain any specific deadlines for agency action." *Id.* at 19.

In this case, the text, structure, and history of section 6707A and related Treasury regulations "express [Congress's] clear intent that APA notice and comment procedures need not be followed." *Asiana Airlines*, 134 F.3d at 398. As illustrated in Section I.A., *supra*, when Congress enacted section 6707A, it did so with the understanding that compliance with tax shelter regulations had become "a joke." *See Corporate Tax Shelters: Looking Under the Roof: Hearing Before the S. Comm. on Finance*, 107th Cong., 2 (2002) (statement of Sen. Max Baucus,

Chairman, S. Comm. on Fin.) [hereinafter *Senate Hearing*].[9] The old regulatory framework was obsolete and the IRS needed a new set of tools to detect and combat abusive transactions. Accordingly, senior IRS officials came and sat before Congress and asked for penalties to enforce their new reporting regime—penalties that would "change the risk reward analysis for taxpayers who would enter into questionable transactions and play the audit lottery." *Id.* at 4.

Congress responded with section 6707A, which not only added penalties for the failure to disclose reportable transactions, but defined "listed transaction" by reference to Treasury regulations that allow the IRS to identify listed transactions by "notice, regulation, or other form of published guidance." 26 U.S.C. § 6707A; 26 C.F.R. § 1.6011-4. This reference is significant because revenue notices, like revenue rulings and procedures, are normally issued without the notice and comment required by the APA. *See* Stephanie Hunter McMahon, *Classifying Tax Guidance According to End Users*, 73 Tax Law. 245, 257 (2020) (noting that revenue notices, rulings and procedures are "[i]ssued without public notice and comment"). Had Congress intended to limit the IRS to ordinary rulemaking, it could have qualified its reference to the regulations prescribed under section 6011.

Plaintiffs raise several arguments in support of their view that Congress intended the listed transaction regime to comply with the APA. Their most persuasive argument is one that was previously noted by this Court; namely, that the IRS should comply with the APA because section 6707A and the related regulations are not "irreconcilable" with it. *See* ECF No. 43 at PageID.579; ECF No. 22 at 255. But while the D.C. Circuit in *Asiana Airlines* noted that the FAA procedures in that case "[could not] be reconciled" with the APA, *Asiana Airlines*, 134 F.3d at 398, the issue here is not formal logical consistency, as the term "reconcile" might

---

[9] Plaintiffs have introduced a copy of the Senate Finance Committee hearing into the record. *See* ECF No. 42-1.

otherwise suggest. The issue is "whether Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Id.*; *see also Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 686 (D.C. Cir. 1984) ("[T]he import of the § 559 instruction is that Congress's intent to make a substantive change be clear.").

The distinction is more than mere semantics. While the IRS *could* operate the listed transaction regime through ordinary rulemaking, doing so would undermine one of the principal purposes of the regime: "[i]dentifying questionable transactions early . . . , in some cases before the transactions even show up on tax returns." *Senate Hearing*, at 8 (statement of Hon. B. John Williams, Chief Counsel, IRS). Rather than prescribing an ordinary regulatory system, Congress, through its enactment of section 6707A, endorsed the flexible reporting regime that the IRS had already developed. Thus, even though Congress did not *mandate* a procedure different from the APA, *cf. Sebelius*, 709 F. Supp. at 19 (noting that alternative rulemaking was "permissive"), it nonetheless expressed a clear intent to "displace the norm," *Asiana Airlines*, 134 F.3d at 397.

Plaintiffs' remaining arguments also fall short. Plaintiffs liken this case to *Cohen*, *supra*, where the D.C. Circuit decided that IRS Revenue Notice 2006-50 was a legislative rule and therefore subject to notice and comment.[10] ECF No. 42 at PageID.445–46. However, *Cohen* did not decide the discrete issue presented here: whether Congress authorized the IRS to promulgate a legislative rule by some means other than notice and comment. As explained in this Court's prior order, *Cohen* stands for the proposition that a revenue notice should be treated as a

---

[10] Notice 2006-50 provided a refund procedure for certain excise taxes. *See* ECF No. 22 at PageID.253 (discussing *Cohen*, *supra*). Notice 2006-50 was not part of the listed transaction regime.

legislative rule to the extent that it changes the rights and obligations of taxpayers. *See* ECF No. 22 at PageID.254. Indeed, the application of 5 U.S.C. § 559 was not even mentioned in *Cohen*.

Plaintiffs next characterize the enactment of section 6707A as "mere acquiescence" to the IRS procedure for identifying listed transactions. *See* ECF No. 42 at PageID.447 (quoting *Skyworks, Ltd. v. Centers for Disease Control & Prevention*, No. 5:20-CV-2407, 2021 WL 911720, at \*12 (N.D. Ohio Mar. 10, 2021)). Plaintiffs argue that even if Congress acquiesced to the IRS approach, it never "expressly approved it" *Id.*

As Defendant explains, however, Congress did not "fail[] to act in the face of agency action"—as the term "acquiesce" would suggest—but "studied the regulations and then enacted legislation that references and utilizes the regulations." ECF No. 44 at PageID.585. Additionally, after section 6707A was enacted in 2004, Congress expanded the listed transaction regime first by extending penalties to nonprofits in 2006,[11] *see* Tax Increase and Reconciliation Act of 2005 § 516, Pub. L. 109–222, and later by enhancing penalties for nondisclosure in 2010, *see* Small Business Jobs Act of 2010 § 2041(a), Pub. L. 111-240. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also Boeing Co. v. United States*, 537 U.S. 437, 457 (2003) ("The fact that Congress did not legislatively override [a preexisting regulation] in enacting [a subsequent statute] serves as persuasive evidence that Congress regarded that regulation as a correct implementation of its intent."); *Reisner v. Comm'r*, 108 T.C.M. (CCH) 518 (T.C. 2014) ("Congress is presumed to be aware of, and to adopt, any longstanding administrative interpretation of the penalty statutes when it takes no step to modify that interpretation.").

---

[11] Section 4965, which expanded the disclosure penalties to nonprofits, defines "listed transaction" by reference to section 6707A. 26 U.S.C. § 4965(e)(1)(B).

Congress had multiple opportunities to clarify its interpretation of section 6707A and surely would have done so if the initial enactment expressed mere acquiescence. Instead, Congress reinforced a reporting regime that was operated without notice and comment and that, under Congress's supervision, has grown considerably in scope.[12] *See Recognized Abusive and Listed Transactions*, IRS, https://www.irs.gov/businesses/corporations/listed-transactions [https://perma.cc/H5JS-PGMK] (last visited May 13, 2021) (naming 36 listed transactions: 34 identified by revenue notice and two identified by revenue ruling).

Plaintiffs' reliance on the legislative history is similarly misplaced. For example, Plaintiffs point to a remark by Senator Charles Grassley during a Senate hearing stating that Congress needed to "be clear and not provide the IRS with tools that allow revenue agents to overreach." *See* ECF No. 42 at PageID.450–51 (quoting *Senate Hearing*, at 13 (statement of Sen. Charles Grassley, Member, S. Comm. on Finance)). Plaintiffs present the Senator's remark as evidence that Congress intended for the IRS to abide by APA notice and comment. In reality, Senator Grassley was expressing his position that Congress should couple the reporting regime with a safe harbor for certain businessowners:

> I am not going to sit around and respect anybody's right to have something if it affects somebody paying lower taxes, then somebody else is going to pick up the bill. So, that is why disclosure is so important. Having said that, we need to be clear and not provide the IRS with tools that allow revenue agents to overreach. A taxpayer engaging in a legitimate business transaction should have a safe harbor with disclosure. It seems to me that we need to couple the safe harbor with disclosure, and that is what the Finance Committee product does.

---

[12] Congress, in fact, continues to supervise the listed transaction regime. *See, e.g.*, Letter from Charles P. Rettig, Comm'r, IRS, to Sen. Charles Grassley, Chairman, S. Fin. Comm. (Feb. 12, 2020), https://www.finance.senate.gov/imo/media/doc/Exhibit%20003%20-%20Letter%20from%20Rettig%20to%20Grassley%20and%20Wyden%20(2020.02.12).pdf [https://perma.cc/EJD3-4JQN] (last visited May 13, 2021) (responding to Senator Grassley's request for more information regarding transactions identified as a result of IRS Rev. Notice 2017-10)

*Senate Hearing*, at 13. Later in the same statement, Senator Grassley praised the IRS efforts at disclosure and even acknowledged that the "serious penalties," which he supported, were intended to "beef[] up the disclosure system." *Id.* at 14. By "disclosure system," Senator Grassley was referring to the IRS' notice-driven reporting regime, not any system operated through ordinary rulemaking. Plaintiffs' conclusion that Congress must have intended for the IRS to comply with notice and comment is untenable on the record at bar.

For the reasons stated above, this Court holds that Congress authorized the IRS to promulgate IRS Revenue Notice 2007-83 without notice and comment. It bears emphasizing that this holding is a narrow one. Plaintiffs' briefing is riddled with appeals to the importance of APA rulemaking and to the plight of taxpayers who, according to Plaintiffs, would "have no protections [without] notice and comment." ECF No. 42 at PageID.456. Even if "notice and comment [is] necessary to obtain the wisest rule," *id.* at PageID.457, this Court cannot substitute its judgment for that of Congress, and no argument is advanced that Congress has exceeded its constitutional authority to legislate.

**IV.**

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 38, is **GRANTED**.

It is further **ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 39, is **DENIED**.

It is further **ORDERED** that the Complaint, ECF No. 1, is **DISMISSED**.

Dated: May 13, 2021                              s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

- 26 -